## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BEYOND GRAVITY SWEDEN AB,<br><br>    Plaintiff,<br><br>v.<br><br>ENSIGN-BICKFORD AEROSPACE & DEFENSE COMPANY,<br><br>    Defendant.<br><br>For provisional relief in aid of arbitration pursuant to Federal Arbitration Act, 9 U.S.C. § 206 | CIVIL ACTION NO.  24-2021<br><br>**COMPLAINT AND REQUEST FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION PENDING ARBITRATION** |

## INTRODUCTION

1. This case concerns a dispute between Plaintiff Beyond Gravity Sweden AB ("BG") and Defendant Ensign-Bickford Aerospace & Defense Company ("EBAD") over the ordering, manufacture, and delivery of satellite subsystems.

2. As described below, BG placed orders for the satellite subsystems at the agreed-upon price, and the parties' contracts require that EBAD, who accepted such orders, to manufacture and deliver the satellite subsystems to BG – namely, Hold & Release Mechanisms ("HRMs") and HRM Firing Units ("HFUs") – for which EBAD holds a market-dominant position over the production of such components as the exclusive source of such products for space application.

3. The parties' agreements do not allow EBAD to conditionally accept BG's purchase orders, demand unilateral increase prices, or fail to deliver. But that's exactly what EBAD did.

4. EBAD has now placed BG in an impossible position. BG must incorporate the satellite subsystems into a larger system that BG will deliver to Amazon for launch into space. But EBAD's contractual breaches have left BG without the necessary satellite subsystems just as delivery to Amazon.com, Inc. ("Amazon") approaches.

5. If BG cannot deliver to Amazon, it will lose more than just money.

6. Unless this Court requires EBAD to cure its breaches, BG would be left irreparably harmed, unable to ever recover its position vis-à-vis Amazon and in the marketplace generally, with its reputation permanently damaged, items that no amount of money damages could cure.

7. Accordingly, Plaintiff BG, by and through its undersigned counsel, and together with the accompanying motion for the same relief, requests that this Court grant a temporary restraining order and a preliminary injunction pending arbitration. BG seeks to restrain and enjoin Defendant EBAD from: (1) unilaterally increasing the price per unit of the HFU/HRMs in contravention of EBAD's contractual obligations and commitments under the Agreement for the Procurement of Separation Subsystem, entered into on June 1, 2022 (the "Supply Agreement"),[1] and the Amendment No. 2 to the Agreement for the Procurement of Separation Subsystem, dated June 19, 2023 ("Amendment No. 2) (the two agreements collectively "Parties' Agreements"); and (2) unilaterally delaying delivery of the HFU/HRMs in further breach of EBAD's contractual obligations under the Parties' Agreements.

---

[1] Relevant excerpts of this Agreement are annexed as Exhibit A to this Complaint.

**ADDITIONAL BACKGROUND REGARDING RELIEF SOUGHT AND ARBITRATION**

8. Section 25 of Supply Agreement (set forth in full below) requires that disputes between BG and EBAD must be resolved via arbitration by the International Chamber of Commerce ("ICC").

9. On December 19, 2024, in accordance with that provision of the Supply Agreement, BG filed a Request for Arbitration with the ICC asserting claims for breach of contract against EBAD (the "ICC Arbitration").

10. By this Complaint and in accordance ICC Rule 28, BG seeks provisional relief in aid of the ICC Arbitration (referred to by the ICC as "Conservatory and Interim Measures") to preserve the status quo pending full and final resolution by the Arbitral Tribunal. *See* International Chamber of Commerce, *Arbitration Rules*, Rule 28, https://iccwbo.org/dispute-resolution/dispute-resolution-services/arbitration/rules-procedure/2021-arbitration-rules/#block-accordion-28.

11. As detailed in Rule 28 and explained in further detail in the accompanying motion, the relief BG seeks aligns with ICC Rule 28 case law in the United States.

**THE PARTIES**

12. BG is a Swedish corporation organized and existing under the laws of Sweden with its registered offices at SE-40515, Goteborg, Sweden. BG is the largest independent provider of space technology in Europe and is the preferred supplier of structures for all types of launch vehicles. BG is also a leader in selected satellite products as well as satellite constellations.

13. EBAD is U.S. company that engages in business that includes the design, development, and manufacture of hardware and systems installed in space launch vehicles. EBAD is a corporation organized and existing under the law of Connecticut that has its principal place of business at 604 Hopmeadow St., Simsbury, CT, 06070, United States.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction of this action under 28 U.S. § 1332 in that the matter in controversy is between a citizen of a State and a citizen of a foreign state and exceeds the sum or value of $75,000, exclusive of interest and costs.

15. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1), because EBAD, the sole defendant, is a resident of the State of Connecticut where this Judicial District is located.

## FACTUAL ALLEGATIONS

**A.  The Subject of the Parties' Agreements: Hold & Release Mechanisms ("HRMs") and HRM Firing Units ("HFUs")**

16. The subject of the Parties' Agreements (*i.e.*, what BG is purchasing from EBAD) are HRMs and HFUs.

17. HRMs and HFUs are component parts for Dispensers manufactured by BG. These Dispensers secure satellites during the pre-launch, launch, and orbital phases of flight and release the satellites into their designated orbits.

18. HRMs are electromechanical devices that physically link satellites to the Dispensers until commands are given to release the satellites in orbit.

19. HFUs are electronic devices that provide fire/release signals to the HRMs.

20. HRMs and HFUs are highly engineered, precision manufactured devices, rigorously tested to ensure flawless operation under the extraordinary physical demands of spaceflight and mission requirements.

21. EBAD is the sole manufacturer of HRMs and HFUs compatible with BG's Dispenser system.

22. BG is the only customer that EBAD has for the specific HRMs and HFUs that BG orders under the Parties' Agreements.

23. BG is under contract to deliver Dispensers to Amazon.com, Inc. ("Amazon") in support of Amazon's Project Kuiper, which is Amazon's effort to deploy a constellation of 3,236 communications satellites in low Earth orbit to provide worldwide internet access.

24. EBAD previously manufactured and delivered the HFUs and HRMs to BG before under POs issued before EBAD began disputing the agreed-to price as detailed below.

**B.     The Supply Agreement**

25. To accomplish the matters described in Section A, *supra*, on or about June 1, 2022, BG and EBAD entered into the Supply Agreement.

26. Section 3 of the Supply Agreement outlines the parties' obligations regarding ordering and delivery. Specifically, Section 3.1 of the Supply Agreement states as follows:

> By way of this Agreement the Purchaser [BG] has the right to issue POs in accordance with this Agreement and Contractor [EBAD] **shall** accept such POs for one or more undertaking phases as per clauses 3. through 8. regarding development and series deliveries of the Contracted Objects. The undertaking phases can be ordered in whole or in part.
>
> The Contractor undertakes irrevocably to carry out the defined phases of one or more POs as per the above and in accordance with the conditions of the Agreement and/or subsequent POs.
>
> Time is of the essence in performance of all POs under this Agreement.

(Emphasis added.)

27. In summary, Section 3.1 grants BG the right to issue "Purchase Orders" or "POs" that EBAD must accept or reject.

28. Section 3.2 of the Supply Agreement states as follows:

5

> In the event of a Purchase Order acknowledgement not being received within 7 working days of the PO, the Purchaser's written PO will be regarded as PO acknowledgement.

29. Thus, Sections 3.1 and 3.2 operate collectively to allow BG to submit Purchase Orders to EBAD and do not provide EBAD any leeway in accepting those POs short of rejecting them entirely.

30. As discussed in greater detail below, this means that, under Sections 3.1 and 3.2 and the Parties' Agreement generally, EBAD is not allowed to alter or conditionally accept the POs, and EBAD's failure to acknowledge the POs as sent to EBAD by BG does not alter the Purchase Order's effectiveness or its binding nature upon EBAD.

31. If EBAD has an issue with a BG PO that it cannot accept or resolve, the Supply Agreement requires that EBAD seek remedy through ICC arbitration.

32. Specifically, Section 25 of the Supply Agreement contains the following arbitration provision:

> Any dispute arising as a result of this Agreement or PO and which cannot be resolved by agreement between the Parties shall submit the matter to settlement proceedings under the ICC (International Chamber of Commerce) ADR rules (Amicable Disputes Resolution). If the dispute has not been settled pursuant to the said rules within 30 days following the filing of a request for ADR or within such other period as the Parties may agree in writing, such disputes shall be finally resolved by arbitration in accordance with the Rules of Conciliation and Arbitration of the ICC by one or more arbitrators appointed in accordance with the Rules. Arbitration shall take place in Stockholm (Sweden) and be conducted in the English language.

33. This provision further underscores that if EBAD has or had a problem with an accepted PO that it did not reject, it was required to address that issue through arbitration before the ICC, which EBAD as failed to do.

**C.     The Parties Agree to New Prices through Amendment No. 2**

34.     Following the execution and partial performance of the Supply Agreement, on or about June 19, 2023, the parties entered Amendment No. 2 that, among other things, modified the pricing for HFUs and HRMs.

35.     Amendment No. 2 includes an attachment titled "Appendix C: Pricing for Agreement for the Procurement of Separation Subsystem" ("Pricing Agreement") which set forth the parties' agreed production cost per unit for the HFU's and HRMs.

36.     The Pricing Agreement provides that the agreed HRM price per unit is $2,925.00 and the HFU price per unit is $13,900.00, as follows:

HRM:

| Production piece price SSD9103CC6: | 2.925 USD | 1 pcs. to 9360 pcs (min qty 5616pcs) | effective till: | 31.12.2026 |
|---|---|---|---|---|

HFU:

| Production piece price: | 13.900 USD | / 1 pcs. to 520 pcs (min qty 312pcs) | effective till: | 31.12.2026 |
|---|---|---|---|---|

37.     The amended Price Agreement further states that HRM and HFU prices are definite and effective through December 31, 2026.

38.     The Pricing Agreement further provides that, "[EBAD] Supplier commits to manufacture and deliver products of the highest quality standard. Prices quoted against each product are assumed to be competitive, withstanding a benchmark at any time."

39.     In sum, as of June 19, 2023, and through December 31, 2026, BG had the right to submit Purchase Orders to EBAD at the above prices, and EBAD was required to fulfill such Purchase Orders at those prices and deliver the units ordered to BG.

40. If EBAD had a problem with a BG Purchase Order, its remedy was to reject a Purchase Order or commence an ICC arbitration against BG, but EBAD failed to do so.

**D.   The BG Purchase Orders that EBAD Accepted But Refused to Honor Necessitating This Complaint**

41. As set forth above, pursuant to Sections 3.1 and 3.2 of the Supply Agreement, BG has the right to issue Purchase Orders to EBAD for delivery of the HFUs and HRMs. EBAD "shall" accept such proper POs, but even if EBAD does not acknowledge the BG POs within seven working days, such POs are accepted and become effective automatically.

42. Following regular performance by the parties after the execution of the Supply Agreement, BG began sending EBAD Purchase Orders, described below, each of which complied with BG's obligations under the Parties' Agreements, obligating EBAD to accept them.

43. On February 23, 2023, BG issued Purchase Order (PO 23-70817) to EBAD requesting delivery of the HRMs and HFUs components.

44. EBAD did not acknowledge this PO within seven days. Under Section 3.2 of the Supply Agreement, EBAD's lack of response constituted acknowledgment of the PO and obligated EBAD to manufacture and deliver the specified units.

45. On July 19, 2023, BG issued Purchase Order (PO 23-72426) to EBAD, requesting delivery of the HFUs components.

46. By this time, Amendment No. 2, with the pricing adjustments, had been signed and was in effect.

47. EBAD did not acknowledge this PO within seven days, which means under Section 3.2 of the Supply Agreement that EBAD acknowledged the PO and was required to manufacture and deliver the units specified therein.

48. Instead, one month later, EBAD sent back PO 23-72426 with redline writing on it, as follows:

> All terms & conditions according to agreement PR-1417274-BGS rev 1 and Amendment No. 2 to agreement PR-1417274-BGS rev 1
>
> Yours faithfully
>
> Beyond Gravity Sweden AB
> Purchase
>
> Anders Håkansson
>
> *EBAD conditionally accepts this purchase order subject to the following terms:*
>
> *1. Beyond Gravity accepts an updated HFU recurring price, to be proposed by EBAD, based on section 14 ("Changes") of PR-1417274-BGS and the qualifying conditions including, but not limited to, the following:*
>   *-A significant number of minor changes to the design of the HFU have occurred throughout the program such that the totality of these changes is now considered a major change from the basis of EBAD's originally proposed HFU design and its acceptance of PR-1417274-BGS.*
>
> *2. EBAD will agree to the shipment dates and associated quantities listed herein based upon #1 being satisfactorily completed.*

49. But nothing in either of the Parties' Agreements allowed EBAD to "conditionally accept" an EBAD Purchase Order.

50. EBAD may not unilaterally impose new terms or reject previously agreed pricing.

51. And nothing in either of the Parties' Agreements allowed EBAD to unilaterally postpone delivery of HRMs and HFUs requested without BG's consent.

52. Further, as set forth above, EBAD and BG had just agreed to a price change in Amendment No. 2 and now EBAD was asking for another one that the Parties' Agreements does not contemplate.

53. For one, seven days after BG had sent the PO it had become accepted. Second, the parties had already agreed in writing to a changed price.

54. On the same date, July 19, 2023, BG issued another Purchase Order (PO 23-72427) to EBAD, requesting delivery of the HRMs.

55. Here too, EBAD responded in a way that violates the Parties' Agreements, stating:

> EBAD conditionally accepts this purchase order according to the following:
>
> -Beyond Gravity accepts EBAD promised delivery dates provided in red for Pos 10 and 20.
>
> -EBAD recognizes Beyond Gravity's desired delivery dates and will endeavor to meet these.

56. Again, nothing in either of the Parties' Agreements allowed EBAD to "conditionally accept []" an EBAD Purchase Order or to unilaterally postpone delivery of HRMs and HFUs requested without BG's consent.

57. EBAD continued this process, redlining the other POs set forth above and claiming that the POs were "conditionally accepted" subject to EBAD's redlines.

58. Then, on August 29, 2023, EBAD sent a letter to BG stating that EBAD required an adjustment from the agreed $13,900.00 to $29,400.00 price per HFU despite the parties agreeing to prices for all units in Amendment No. 2 less than three months prior.

59. This practice continued, with EBAD affirmatively admitting its breaches and stating its intention to continue to do so.

60. For instance, on December 27, 2023, EBAD sent another letter to BG stating that "EBAD [would] hold off on further discussions over these redline counteroffers until [the parties] have come to resolution on the pricing discussions."

61. But nothing in the Parties' Agreements allowed EBAD to make "redline counteroffers" because it is dissatisfied with the price it agreed to in Amendment No. 2.

62. To the contrary, and as set forth in black and white above, Sections 3.1 and 3.2 of the Supply Agreement governs the process for ordering these units and Amendment No. 2 dictated their prices.

63. On March 22, 2024, EBAD sent BG yet another letter requesting an adjustment of the recurring price of the HFU up to $83,100 per unit.

64. In the same letter, EBAD unilaterally sought to raise the price of the HRM from $2,925.00 to $5,645.00 per unit.

65. EBAD has based these ransom threats on Section 14 of the Supply Agreement, which reads in relevant part as follows:

### 14 CHANGES

### 14.1 General

Both Parties shall actively and continually contribute to that the Contracted Object will be optimised from a cost, quality and time aspect by suggesting improvements. This shall preferably be done as early as possible during the development phase, but changes can also be introduced and implemented in later phases.

Each Party shall keep the other Party informed on possible critical dates about decision on changes and shall promptly process all requests for changes.

Minor changes shall be implemented without cost to the Purchaser.

### 14.2 Change request

Changes requested by the Contractor shall be sent to the Purchaser stating the nature of the change and the technical, safety, financial and time related consequences.

After processing by the Purchaser, the change request shall be returned to the Contractor with a decision attached. Revised documents shall be promptly submitted.

Changes requested by the Purchaser shall be sent to the Contractor for evaluation.

After processing by the Contractor, the change request containing the Contractor's evaluation stating the technical, safety, financial, and time related consequences shall be returned to the Purchaser within 14 calendar days.

After final processing by the Purchaser a copy of the change request shall be sent to the Contractor with the decision attached. Revised documents to be promptly submitted.

> In applicable cases the change decision is to be confirmed by a revision of this Agreement and/or the PO.

66. EBAD's contentions that Section 14 allowed it to modify prices, to do so after accepting Purchase Orders, to refuse to manufacture and deliver ordered units, are without merit.

67. First, Section 14 states only with respect to price changes that the parties will attempt to optimize cost; Section 14 states nowhere that EBAD could alter the price from the Parties' Agreements, no less than it could do so unilaterally.

68. The only refence that Section 14 must cost at all is its use of the word "financial." But that word is used with reference to BG's obligation to state to EBAD the financial impact of its requested changes and EBAD's corresponding obligation to evaluate BG's requested change and to reply with its assessment of potential financial impacts.

69. Notably, EBAD never did so.

70. Instead, as set forth above, EBAD simply requested changes in response to already accepted Purchase Orders. And it did so *after* the sole major change that BG requested, the one that led the parties to re-negotiate price and sign Amendment No. 2.

71. In other words, EBAD demanded additional price increases after it had already negotiated for one under Section 14 of the Supply Agreement.

72. Nothing in the Parties' Agreements permitted EBAD to do so.

73. EBAD also demanded price increases after it accepted BG's Purchase Orders, in contravention of Section 3 of the Supply Agreement.

74. Accordingly, to date, BG has not agreed to any of the conditions EBAD has asserted related to price increase or delivery postponement.

12

75. On April 29, 2024, BG replied to EBAD's March 22, 2024, letter stating that BG would neither accept EBAD's requested price adjustment, nor would it agree to EBAD's request for postponing delivery of the HFUs.

76. In response, EBAD has refused to deliver.

77. That is yet another breach by EBAD of the Parties' Agreements.

### E. EBAD Doubles Down on Its Breaches

78. In May 2024, EBAD claimed by letter that it was unilaterally rescinding the above-referenced POs and is not bound by them.

79. BG attempted to resolve the parties' dispute, but to no avail.

80. Later that month, BG—despite being under no obligation to do so—indicated a willingness to EBAD to negotiate price and EBAD's attempted change of delivery schedule.

81. EBAD refused to budge on its prior demands.

82. This process repeated itself in August 2024, when the parties met in person to mediate before the International Chamber of Commerce.

83. In September 2024, BG offered to pay EBAD for the HFUs and HRMs under protest, knowing that it would recover the price difference between is demanding and what Amendment No. 2 calls for if when it commences arbitration before the ICC.

84. EBAD refused.

85. The parties continued discussions into November 2024, but EBAD has not budged.

86. BG cannot obtain the units it properly ordered and EBAD accepted through the above-referenced POs, because even if it pays EBAD under protest so that it can later collect its damages through arbitration, EBAD will not deliver.

87. Yet, upon information and belief, EBAD has already produced additional HFUs and is withholding delivery to exert leverage in this dispute.

88. Even so, the quantity of those already-manufactured units are insufficient; BG still will incur imminent and irreparable harm because the quantity of units needed for each upcoming launch is greater than what has been produced.

89. Further, upon information and belief, EBAD's manufacturing line remains operational, so in addition to the already manufactured units, EBAD could deliver the remainder that BG ordered through the above-referenced POs as EBAD is contractually obligated to do.

**F.     If EBAD Does Not Deliver, It Will Cause BG Immediate and Irreparable Harm**

90. BG attempted to save the Parties' Agreements, but it can no longer do so without court intervention because it's time to perform for Amazon is near, and if BG cannot do so, which would be caused by EBAD's failure to deliver to BG, BG will suffer immediate and irreparable harm.

91. BG is contractually obligated to begin delivering Dispensers to Amazon by the end of this month.

92. To meet this deadline, BG requires immediate HFU delivery from EBAD.

93. Upon information and belief, each HFU requires approximately 50 days to manufacture, and due to production constraints, all units cannot be manufactured simultaneously.

94. If EBAD is not compelled by this Court to adhere to the Amendment No. 2 price as BG seeks here, EBAD will not have enough time to manufacture and deliver the units to BG before its Amazon deadline, forcing BG to breach its obligations with Amazon.

95. Under Amazon's contract with the United States government, it has only a certain window to launch these satellites before it will lose its certification license. Accordingly, if

Amazon misses that window because BG was delayed as a result of EBAD's breaches, Amazon likely will blame BG, thereby tarnishing BG's reputation throughout the industry.

96. Furthermore, BG faces additional deadlines in the coming months for Amazon, meaning this issue could repeat itself if unresolved.

97. That would cause BG to be late or unable fulfill its commitments to Amazon, which would irreparably harming BG's relationship with Amazon and jeopardizing potential future contracts.

98. Similarly, if BG does not come through for Amazon, its industry goodwill reputation would be irreparably and permanently tarnished, disabling it from obtaining other customers even if they existed.

99. Moreover, given the lack of manufacturers in this industry, BG cannot simply initiate an arbitration against EBAD, obtain money damages, and then later find another customer—none exist.

100. Accordingly, time is of the essence. If this Court does not require the interim relief sought, that EBAD be prevented from dishonouring the contract prices, BG will suffer precisely the damage that temporary restraining orders and preliminary injunctions, as well as "interim relief" under Article 28 of the ICC's rule, are intended to prevent.

**G. BG is Simultaneously Commencing an ICC Arbitration**

101. Pursuant to the dispute resolution clause in the Supply Agreement, on December 19, 2024, BG initiated arbitration proceedings with the ICC relating to the dispute described herein.

102. BG asserts that EBAD's unilateral price increase, and refusals and delayed deliveries constitute a material breach of the Supply Agreement under Swedish law.

103. In its Request for Arbitration, BG seeks specific performance of the Supply Agreement and damages arising from EBAD's breaches.

104. But unlike this Court, the ICC cannot provide BG the immediate relief it needs.

105. As set forth in detail in the accompanying motion and its exhibits, although the ICC has an emergency process, the process itself and enforcing it under the New York Convention take too long and would not allow BG to meet the Amazon deadlines.

106. In absence of the requested injunctive relief, the very harm that BG seeks to redress by way of arbitration—mainly, the termination of its agreement with Amazon for supplying Dispenser's in support of Project Kuiper and the loss of its customer relationships and goodwill—will occur before an award can be rendered in the ICC Arbitration.

107. Thus, the parties' arbitration will be effectively rendered moot, unless the status quo is preserved.

## PRAYER FOR RELIEF

108. Although Section 25 of Supply Agreement requires the parties to arbitrate before the ICC, pursuant to the Federal Arbitration Act, 9 U.S.C. § 206, which authorizes this Court to enter an Order directing that the arbitration proceed in the manner provided for in the arbitration agreement, and ICC Rule 28, this Court is empowered to afford BG interim, injunctive relief.

109. Doing so would preserve the meaningfulness of the parties' arbitration before the ICC by preventing EBAD from irreversibly altering the status quo and depriving BG the benefit of its bargain.

110. Any award to which BG may be entitled to in the ICC Arbitration may be rendered ineffectual without appropriate injunctive relief.

**WHEREFORE**, BG prays that a temporary restraining order and preliminary injunction be entered pending the resolution of the ICC Arbitration as follows:

a) restraining and enjoining EBAD from repudiating its contractual obligations and commitments under the Supply Agreement;

b) restraining and enjoining EBAD from unilaterally increasing the agreed-upon price per product unit for the HFUs and HRMs by enforcing the prices in Amendment No. 2;

c) restraining and enjoining EBAD from unilaterally delaying delivery beyond the agreed upon delivery schedule of the HFUs and HRMs by enforcing BG's Purchase Orders; and

d) granting such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: December 20, 2024 | Respectfully submitted, |
| | **BEYOND GRAVITY SWEDEN AB** |
| | By: Their Attorneys |
| | */s/ Marissa I. Delinks* |
| | Marissa I. Delinks (CT Bar No. 29369) |
| | **HINSHAW & CULBERTSON LLP** |

Marissa I. Delinks (CT Bar No. 29369)
Aaron A. Fredericks (CT Bar No. 29871)
HINSHAW & CULBERTSON LLP
53 State Street, 27th Floor
Boston, MA 02109

-and-

Evan Kwarta (pro hac vice forthcoming)
HINSHAW & CULBERTSON LLP
800 Third Avenue, 13th Floor,
New York, NY 10022
212-655-3839
212-935-1166 (facsimile)

-and-

Steven L. Boldt (pro hac vice forthcoming)
Gregory M. Emry (pro hac vice forthcoming)
HINSHAW & CULBERTSON LLP
151 North Franklin Street
Suite 2500
Chicago, IL 60606
312-704-3000
312-704-3001 (facsimile)

| | |
|---|---|
| Dated: December 20, 2024 | Respectfully submitted, |
| | **BEYOND GRAVITY SWEDEN AB** |
| | By: Their Attorneys |
| | */s/ Marissa I. Delinks* |
| | Marissa I. Delinks (CT Bar No. 29369) |
| | **HINSHAW & CULBERTSON LLP** |

Marissa I. Delinks (CT Bar No. 29369)
Aaron A. Fredericks (CT Bar No. 29871)
HINSHAW & CULBERTSON LLP
53 State Street, 27th Floor
Boston, MA 02109

-and-

Evan Kwarta (pro hac vice forthcoming)
HINSHAW & CULBERTSON LLP
800 Third Avenue, 13th Floor,
New York, NY 10022
212-655-3839
212-935-1166 (facsimile)

-and-

Steven L. Boldt (pro hac vice forthcoming)
Gregory M. Emry (pro hac vice forthcoming)
HINSHAW & CULBERTSON LLP
151 North Franklin Street
Suite 2500
Chicago, IL 60606
312-704-3000
312-704-3001 (facsimile)

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2024, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.

*/s/ Marissa I. Delinks*