UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BEYOND GRAVITY SWEDEN AB ) ) Plaintiff, ) ) v. ) ) ENSIGN-BICKFORD AEROSPACE & ) DEFENSE CO., ) ) Defendant. | CASE NO. 3:24-CV-2021 (OAW) |

**ORDER DISPOSING OF MOTION FOR PRELIMINARY INJUNCTION**

The parties in this case, Plaintiff Beyond Gravity Sweden AB ("Beyond Gravity") and Defendant Ensign-Bickford Aerospace & Defense Company ("EBAD"), are two aerospace companies with a symbiotic relationship, jointly benefiting from their support for Amazon's satellite program. However, Beyond Gravity filed the instant motion seeking a preliminary injunction to enjoin EBAD from repudiating its contractual obligations; specifically, it insists EBAD honor pricing set by Amendment 2 to their Supply Agreement. EBAD had been producing Hold & Release Mechanisms ("HRMs") and HRM Firing Units ("HFUs") to Beyond Gravity, and Amendment 2 (executed June 19, 2023) set a firm price of $13,900 per HFU,[1] with agreed production of between 312 and 520 HFUs. Additionally, the motion seeks to prevent EBAD from delaying delivery of HFUs and HRMs as previously agreed.

The parties appeared before the undersigned for a hearing on January 14, 2025. After careful review of all arguments and evidence presented at the hearing and through the docket, the court hereby **DENIES** Beyond Gravity's motion for a preliminary injunction.

---

[1] In Amendment 2, the parties agreed that such firm pricing would be valid until December 31, 2026.

1

I. **PRIOR PROCEEDINGS**

Beyond Gravity filed this action on December 20, 2024, asserting that EBAD breached its contractual obligations, insisted on higher prices than those previously agreed, and refused to perform and deliver HFUs and HRMs until the parties resolved their price dispute, thereby delaying Beyond Gravity's ability to perform vis-à-vis its customer, Amazon.com, Inc. ("Amazon").

That same date, Beyond Gravity moved for a Temporary Restraining Order ("TRO") and Preliminary Injunction. ECF No. 2. At a hearing on December 26, 2024, Judge Chatigny denied Beyond Gravity's request for a TRO and instructed the parties to mediate their dispute such that further litigation might be avoided.[2]

The undersigned presided over a hearing on January 14, 2025, at which the following evidence was presented.

II. **FINDINGS OF FACT**[3]

A. **Background**

Sometime before June 1, 2022, Beyond Gravity entered into a contract to deliver "Dispensers" to Amazon, in support of its Project Kuiper satellite program. ECF No. 1, ¶ 23. Those Dispensers (HRMs and HFUs) "secure satellites during the pre-launch, launch, and orbital phases of flight and release the satellites into their designated orbits which is Amazon's effort to deploy a constellation of 3,236 communications satellites in low Earth

---

[2] The Honorable Judge Robert N. Chatigny presided over that hearing in his capacity as duty judge, and the undersigned extends his sincere thanks and appreciation for Judge Chatigny so immediately lending his expertise, experience, and availability to the proceedings on short notice and during the holiday season.
[3] The court assumes the parties familiar with the facts in this matter and recounts only those facts necessary for its ruling.

2

orbit to provide worldwide internet access." *Id.* HFUs require 55 days to manufacture. ECF No. 2-2 ¶ 55.

### B. The Parties Form a Partnership

On June 1, 2022, Beyond Gravity and EBAD entered into the "Agreement for the Procurement of Separation Subsystem Supply Contract." ECF No. 1-1. That contract established terms by which EBAD would supply HRMs and HFUs to Beyond Gravity. *See generally id.* These components were necessary for Beyond Gravity to fulfill its own obligations to Amazon, and for Project Kuiper.

Under Section 3.1 of the Supply Agreement, Beyond Gravity "has the right to issue [Purchase Orders]" and EBAD "shall accept such [Purchase Orders]." ECF No. 1-1, pg. 9. Section 3.2 provides that any purchase order that remains unacknowledged within seven days of transmittal from Beyond Gravity to EBAD will be regarded as accepted. *Id.*

On February 23, 2023, Beyond Gravity issued a purchase order ("PO 23-70817") for 34 HFUs with delivery dates ranging from late 2023 through May 2024. ECF No. 2-2, pg. 12.

On or about June 19, 2023, the parties executed Amendment 2 of the contract, which at Appendix C established new pricing for HRMs. Amendment 2 did not alter pricing for HRUs.[4] However, prices under that agreement were "firm"[5] and would remain in effect until December 31, 2026. ECF No. 32-12, pgs. 4-5.[6]

---

[4] For its part, EBAD contends the parties agreed to table HRU price negotiations until a later date.
[5] At the hearing on January 14, EBAD argued the court ought to put little weight into the parties' amendment because the Raji declaration, Exhibit 11, and Exhibit 12 demonstrate that there was an expectation that recurring prices for HFUs would be discussed at a later date. *See* Raji Decl., ¶ 68 (ECF No. 32, pg. 17). The record before the court is insufficient to draw that conclusion, especially if the court considers that the Amendment's clear and unequivocal language states that the prices would remain "firm" and subsequent communications from EBAD's President sought to "kickoff" HFU pricing discussions. ECF No. 2-2, pg. 23.
[6] The court references pagination from the CM/ECF system and not the pagination provided by the parties.

3

On July 19, 2023, Beyond Gravity issued a purchase order ("PO 23-72426") for 140 HFUs with delivery dates ranging from July 2024 through December 2024. ECF No. 2-2, pg. 14.[7]

### i. Relations Strained by Purported Changes to Component Design

On or about August 29, 2023, EBAD's President, Chad Thompson, sent a letter addressed to Paul Horstink, Beyond Gravity's Executive Vice President of Launchers, requesting that the parties "kickoff discussions regarding an adjustment to the recurring price of EBAD's HRM Firing Unit (HFU)." ECF No. 2-2, pg. 23. Thompson's letter suggested a "target recurring price" of $29,400 per HFU. *Id.* That price represented a nearly 112 percent increase over the original agreed upon price, $13,900. In an email dated September 6, 2024, Thompson reiterated that EBAD was in a "grossly negative GM situation related to the HFU recurring hardware price." ECF No. 32-17, pg. 2.

Horstink responded to Thompson's letter and email by acknowledging the pricing issues. He wrote, "Unfortunately the gap you present in the letter is significantly higher than we expected, but let's proceed as agreed and first get the teams to focus on closing the GAP as much as possible." *Id.*

### ii. The Parties Agree to Disagree

At some point later in September, Beyond Gravity and EBAD met at the latter's production facilities in Moorpark, California. ECF No. 32-19, pg. 2. In an email addressed to various employees of both companies, Beyond Gravity thanked EBAD for hosting its

---

[7] That same day, Beyond Gravity issued a separate purchase order ("PO 23-72426") for HRMs. EBAD did not explain why, if the prices for HRMs were firm pursuant to Amendment 2, it would have rescinded its counteroffer for PO 23-72426, which exclusively requested HRMs.

4

contingent and expressed appreciation for a site tour, adding "[Beyond Gravity was] glad to see that [EBAD's] HRM production line is getting ready for the ramp-up." *Id.*

On October 3, 2023, Thompson wrote another letter to Horstink. This time, Thompson said he understood, considering recent discussions between the parties, that the schedule, and not the cost and scope of HFUs, "is the most critical aspect of the Kuiper program." ECF No. 32-24, pg. 2.

Starting late 2023 or early 2024, the parties agreed that the companies would keep commercial disputes separate from their technical and delivery discussions. That agreement sought to focus the technical teams on "mission success" without bogging them down in the minutia of pricing. See ECF No. 32-28, pg. 2. In the meantime, EBAD would analyze scope and cost changes and present them to Beyond Gravity for review. *Id.* at 3.

On December 27, 2023, Thompson sent a letter to Horstink explaining that EBAD would "hold-off" on further discussion regarding counteroffers it submitted with respect to Purchase Orders 23-72427, 23-70817, and 23-72426. ECF No. 32-28, pg. 3.

### iii.   Impasse

On March 22, 2024, EBAD further increased its demands, seeking $83,100 per HFU and $5,645 per HRM. ECF No. 32-30, pg. 2. EBAD followed-up on that demand by way of email sent by Thompson to Horstink, foretelling that the parties would soon be at "impasse" unless Beyond Gravity capitulated. ECF No. 32-31, pg. 2. He added that the parties needed to "bridge the gap between the originally quoted design configuration and the current design configuration" and "address the cost of all the scope changes so that we can support follow-on launches." *Id.*

After a failed attempt to meet for in-person negotiation, Beyond Gravity observed it was "running out of time." In a letter on March 29, 2024, signed by Per Lovatt, Managing Director at Beyond Gravity (and declarant Artner) to Thompson, Beyond Gravity expressed concern that EBAD was not abiding by terms of the contract and cited the same.[8] ECF No. 32-33, pgs. 2-3.

### iv. **Breakdown**

The parties sought to meet in Simsbury, Connecticut, on May 6-7, 2024, to discuss their cost differences in the presence of Amazon. ECF No. 32-34, pg. 2. As to Amazon, the parties would discuss "how [they] can support to secure stable deliveries in the coming weeks, months and in the future; considering cost challenges @ EBAD." ECF No. 32-34, pg. 2. During a meeting on May 6, 2024, Artner described a "cost build-up analysis" he claimed Beyond Gravity completed, concluding that a cost of between $38,000 and $40,000 per HFU would be appropriate. ECF No. 32, Raji Decl. ¶ 59. Artner "also suggested that [Beyond Gravity] could manufacture HFUs itself at or near that cost." *Id.*

The dispute reached a critical juncture on May 17, 2024. Beyond Gravity sent a letter addressed to Thompson indicating that while traditionally it had worked collaboratively with EBAD, its view was that EBAD "requested exorbitant price increases for both HRM and HFU products." ECF No. 32-35, pg. 3. Also on May 17, Horstink emailed Thompson and Edris Raji expressing that Beyond Gravity was "extremely concerned about the comments made about stopping activities for crucial deliveries for this year which will further put our commitments to Amazon at risk and potentially further delay the scheduled Kuiper launches for this year." ECF No. 32-36, pg. 4. Horstink

---

[8] Specifically, the letter pointed EBAD to the Request for Deviations section and Beyond Gravity's right to seek liquidated damages.

continued, "we of course had to inform Amazon about the risks for their delivery and launch schedule due to approach taken by EBAD and various comments made in meetings about no willingness to continue working on the committed deliveries for this year." *Id.* at 4-5.

One week later, Remigius Fent, General Counsel of Beyond Gravity, emailed EBAD to note that he had been charged with reviewing "the behavior of EBAD in terms of misuse of market dominant position." He explained that he wanted to give EBAD "a chance" to find an amicable solution and forego its attempts to extract "predator pricing" which he claimed would be of "interest for the US anti-trust authorities." ECF No. 32-37, pg. 2.

> **v.    Mediation and the Instant Lawsuit**

The following week, Beyond Gravity expressed its intent to initiate settlement proceedings through the International Chamber of Commerce ("ICC"), while reserving all rights. ECF No. 32-38, pg. 5.

On September 3, 2024, Beyond Gravity ceased its participation in mediation. ECF No. 32-40, pg. 2. In a letter dated September 3, 2024, exchanged between counsel for both parties, Beyond Gravity said it "will now prepare for arbitration and explicitly reserves all rights, including but not limited to legal action as regards repayment of Additional Price HFU/HRM, compensation for delay of delivery and any other remedy available." ECF No. 2-2, pg. 52.

After another three months (or 107 days), Beyond Gravity filed a Request for Arbitration with the ICC. ECF No. 2-5, pg. 2. On December 20, 2024, Beyond Gravity filed the instant motion seeking a preliminary injunction.

7

It is unclear when Amazon will perform its next launch. For its part, Beyond Gravity has provided numerous different deadlines for parts, including December 20, 2024, *see* ECF No. 2-2 ¶ 63 (requesting the components be delivered the same day the motion for an injunction was filed if EBAD were able to ship the products to Sweden), early January 2025, *see* ECF No. 2-5, pg. 11 (as of December 19, 2024), January 15, 2025 (as of the December 26, 2024, hearing), the beginning of March (as of the January 14, 2025, hearing), and April (as of the January 14, 2025, hearing).

### III. LEGAL STANDARD

#### A. Overview

"A preliminary injunction is an extraordinary and drastic remedy" and should never be awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 679 (2008) (internal quotation marks and citation omitted); *see Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024).

To obtain a preliminary injunction, a party must clearly show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024). Motions for preliminary injunctions are "frequently denied if the [movant's briefing is] too vague or conclusory to demonstrate a clear right to relief under Rule 65." 11A C. Wright & A. Miller, *Fed. Practice & Proc*, § 2949 (2004); *see Huber Baking Co. v. Stroehmann Bros. Co.*, 208 F.2d 464 (2d Cir. 1953).

### B. <u>Irreparable Harm</u>

"A plaintiff seeking a preliminary injunction must establish that. . .[it] is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff's burden is substantial. *Daileader*, at 358. The element of irreparable harm is the *sine qua non* for obtaining preliminary injunctive relief. *USA Recycling v. Town of Babylon*, 66 F.3d 1272, 1294-1295 (2d Cir. 1995); *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 47 F. Supp. 2d 451, 460 (S.D.N.Y. 1999).

The United States Court of Appeals for the Second Circuit has defined irreparable harm as an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (internal quotation marks omitted). Neither the "mere possibility of harm" nor lost profits are sufficient on their own. *Freeplay Music, Inc. v. Verance Corp.*, 80 F. App'x 137, 138 (2d Cir. 2003); *Vargas v. Viacom Int'l, Inc.*, 366 F. Supp. 3d 578, 582 (S.D.N.Y. 2019) (internal quotation marks and citation omitted). But irreparable harm may exist where loss of customers and the competitive disadvantage from an inability to supply customers with a terminated product is "clearly shown." *Freeplay Music*, 80 F. App'x 138.

### i. <u>Delay</u>

"A district court should generally consider delay in assessing irreparable harm." *Tom Doherty Associates, Inc. v. Saban Entertainment Inc.*, 60 F.3d 27, 39 (2d Cir. 1995). That is because a preliminary injunction implies an "urgent need for speedy action to protect the plaintiff['s] rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Therefore, delay "indicates an absence of the kind of irreparable harm required to support a preliminary injunction." *Id.* at 276. "There is no bright-line rule

for how much delay is too much, but courts in this Circuit 'typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Monowise Ltd. Corp. v. Ozy Media, Inc.*, 17-cv-8028 (JMF), 2018 U.S. Dist. LEXIS 75312, 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (collecting cases); *see Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); *see also New York v. United States Department of Commerce, 339 F. Supp. 3d 144, 149* (S.D.N.Y. 2018) (In the context of a motion to stay proceedings pending mandamus review, there was no irreparable harm where party delayed 2-months before filing motion).

However, delays attributable to negotiating a new contract or settlement efforts should not preclude finding irreparable harm.  *See Bristol Tech., Inc. v. Microsoft Corp.*, 42 F. Supp. 2d 153, 162 (D. Conn. Dec. 30, 1998) (finding no delay where there were good-faith efforts at negotiating a new contract); *Kraft Gen. Foods v. Allied Old English*, 831 F. Supp. 123, 126 n. 12 (S.D.N.Y. Jun. 11, 1993) ("[Movant] should not be penalized for any delay arising out of settlement efforts.").

### ii.     Other Available Remedies, Damage to Reputation and Good Will

"A basic principle of equity is that equitable remedies will not be awarded where the plaintiff has an adequate remedy at law."  *KMart Corp. v. First Hartford Realty Corp.*, 810 F. Supp. 1316, 1331 (D. Conn. Jan. 4, 1993) (citing *Cahill v. Board of Education of the City of Stamford,* 187 Conn. 94, 98, 444 A.2d 907 (1982)).

Damages are traditionally considered the "classic remedy" for a breach of contract action.  *Register.com, Inc. v. Verio*, 356 F.3d 393, 426 (2d Cir. 2004) (citing *Borey v. National Union Fire Insurance Co.*, 934 F.2d 30, 34 (2d Cir. 1991)).  Damages are "the

rule, not the exception." *AFA Dispensing Group B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 473 (S.D.N.Y. Aug. 20, 2010) (quoting *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 195 (S.D.N.Y. Jun. 12, 1990)).

But not all breach of contract damages can be quantified, and a company's "loss of reputation, good will, and business opportunities" from such a breach can constitute irreparable harm. *Register.com*, at 404; *PCS Wireless LLC v. A to Z Wireless Solutions Inc.*, 841 F. Supp. 2d 649, 652 (S.D.N.Y. Jan. 18, 2012) ("Courts generally are reluctant to grant preliminary injunctions in breach of contract actions, unless there are damages that are difficult to measure and there is a risk of loss of goodwill, reputation, or business opportunities.") (citing *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 Fed. App'x 779, 781 (2d Cir. 2010)). However, "conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *M.V. Music v. V.P. Records Retail Outlet, Inc.*, 653 F. Supp. 3d 31, 39 (E.D.N.Y. Jan. 27, 2023).

### C. Likelihood of Succeeding on the Merits or Serious Questions

"The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

The serious questions standard is "no lighter than the one [the movant] bears under the likelihood of success standard. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). That is because the movant who invokes the serious questions standard must demonstrate both serious

11

questions on the merits and a balance of hardships decidedly favoring the movant. *State Farm*, 120 F.4th 79-80.

To balance hardships, the court weighs the competing claims of injury and must consider the effect on each party of granting or withholding the requested relief. *Winter*, at 24.

IV. **DISCUSSION**

 A. **Irreparable Harm**

  i. **Delay**

Beyond Gravity's delay undercuts finding irreparable harm. By March 2024, Beyond Gravity *understood* it was "running out of time" and that the parties may soon reach "impasse." ECF Nos. 32-31, pg. 2; 32-33, pgs. 2-3. On May 17, 2024, it was "extremely concerned" deliveries would not be made on schedule. *See* ECF No. 32-36, pg. 4. Mr. Horstink understood EBAD had "no willingness to continue working on the committed deliveries." *Id.*, at 4-5. The risk was readily apparent. One *could* reasonably conclude that Beyond Gravity delayed over six months in seeking a preliminary injunction, but the court is hesitant to disincentivize legitimate attempts at mediation. *See Kraft*, 831 F. Supp. 123, 126 n. 12 (S.D.N.Y. Jun. 11, 1993) ("[Movant] should not be penalized for any delay arising out of settlement efforts."); ECF No. 32-38, pg. 5.

The court concludes that Beyond Gravity delayed at least three months before filing this lawsuit.[9] On September 3, 2024, Beyond Gravity ceased its participation in

---

[9] The court need not determine whether there was additional delay by Beyond Gravity after EBAD rescinded its counteroffers and Beyond Gravity proceeded to mediation, as two months of inactivity itself supports a finding of delay in pursuing a preliminary injunction. *Weight Watchers Int'l, Inc.*, 423 F.3d 144; *Monowise*, 2018 WL 2089342, at *2; *see* ECF No. 32-28, pg. 3.

mediation and declared its intent to compel EBAD to arbitration. ECF Nos. 2-2, pg. 52; 32-40, pg. 2. After that, Beyond Gravity appears to have been floating aimlessly in space. The delay is less excusable considering Beyond Gravity's belief that "[t]he deadlines for Amazon's launches are strict, leaving no room for delays." ECF No. 2-1, pg. 6. The length of the delay weighs against finding irreparable harm. *See Monowise*, 2018 WL 2089342, at *2.[10] Indeed, the arbitral panel may well have reached a resolution by now had Beyond Gravity promptly filed its complaint. Thus, prompt filing may well have resulted in EBAD producing the required components before Amazon's March (or April) launch.

The court does not deny Beyond Gravity's motion on delay alone. To be sure, delay "standing alone" *may* "preclude the granting of preliminary injunctive relief." *See Tough Traveler, Ltd. V. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995); *Firemen's Ins. Co. of Newark, New Jersey v. Keating*, 753 F. Supp. 1146, 1158 (S.D.N.Y. Dec. 21, 1990). However, the delay in this case is not so significant that it forbids relief, *ceteris paribus*.

    ii. **Conjectural or Speculative Harm**

        a. **Launch Dates**

Even after briefing and oral argument, the date of the next Amazon launch remains unclear. The plaintiff's briefing and oral argument failed to establish when Amazon would launch its next rocket, even presuming the delivery of all necessary components. Four different dates were offered by the plaintiff, including "early January," "January 15," the

---

[10] The court observes that several frequently cited cases in this circuit concern intellectual property matters, such as trademark infringement. *See, e.g., Tough Traveler*; *Citibank, N.A. v. Citytrust*, 756 F.2d 273. And if one were to continue tracing back that legal authority, a Lanham Act (or other intellectual property-based cause of action) almost always tends to form the bedrock legal foundation for the principle that delay undercuts irreparable harm. The court saw little reason to explain why a contract action actually might be subject to a stricter standard of delay than is a Lanham Act case.

beginning of March, or sometime in April. Additionally, rocket launches frequently are postponed for reasons unrelated to delivery delays.[11] In sum, the court is unpersuaded that the harm Plaintiff describes is certain and imminent. "The mere possibility of harm is not sufficient to warrant the drastic imposition of a preliminary injunction." *Vargas v. Viacom Int'l, Inc.*, at 582. The irreparable harm, if any, may well be felt only after the parties resolve their dispute through arbitration.

### b.  Customer Relationship (Amazon) and Good Will

This case is unlike others where there is record evidence of a genuine threat customers may go elsewhere. *See, e.g., Millennial Plastic Surgery PLLC v. James*, No. 21-cv-9590 (ER), 2021 WL 5988322, 2021 U.S. Dist. LEXIS 241588, *4 (S.D.N.Y. Dec. 16, 2021) ("Plaintiff has submitted evidence of several individuals expressing that they will no longer seek Plaintiff's services"); *Env't Servs., Inc. v. Recycle Green Servs., Inc.*, 7 F. Supp. 3d 260, 279 (E.D.N.Y. Mar. 25, 2014) (movant established irreparable harm where record indicated customers refused to do business with movant in the future and were providing negative reviews of movant to other potential customers); *cf. Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 210 (S.D.N.Y. Jun. 5, 2000) (granting injunction where "the evidence attests to the willingness of [] customers to abandon Norcom in the event that Norcom can no longer supply this product"); *see also See Reuters Ltd. v. United Press Int'l, Inc.*, No. 90-cv-1098 (PKL), 1990 WL 29387, at *5

---

[11] There is ample public reporting on delays associated with Project Kuiper. *See, e.g.,* Alan Boyle, "Technical snag forces another delay for the first orbital launch of Blue Origin's New Glenn rocket," Geekwire (Jan. 11, 2025); James Rogers, Amazon faces $1.5 billion Project Kuiper headwind in 2025 after satellite launch delay: Morgan Stanley, Morningstar (Oct. 11, 2024) ("The first full-scale Kuiper mission had been targeted for the fourth quarter of this year, but Amazon's launch partner, United Launch Alliance, recently pushed it back to early 2025 to enable two U.S. Space Force missions in the fourth quarter."); Michael Kan, Amazon's Starlink Rival, Project Kuiper, Faces Another Delay, PCMag (Jun. 27, 2024) (explaining Amazon's launch would take place sometime in Q4 2024).

14

(S.D.N.Y. Mar. 13, 1990) ("In deposition testimony placed before the Court by the parties, officers of UPI assert that they have spoken to customers who have stated that they will discontinue their subscriptions to UPI's service if the connection to Reuters is lost."), *rev'd*, 903 F.2d 904 (2d Cir. 1990) (reversing lower court, in part, because the record included actual threats to stop dealing with the distributor if it cannot continue to supply that product).

The record is devoid of evidence indicating that there is an imminent and actual risk that Beyond Gravity will lose Amazon as a customer. Nor is it clear that the court should infer anything from Amazon's repeated launch delays where nothing in the record (and ample public reporting, *see supra*, note 3) suggests that the production delays are to blame. As far as the record is concerned, Beyond Gravity harbors unsubstantiated fears of what the future might have in store.[12] *Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 486 (W.D.N.Y. Jun. 15, 2018) ("In failing to supply evidence of the loss of reputation or good will beyond his own conclusory averments, Plaintiff has not made a sufficient showing that irreparable harm is likely at this point in this action.").

### iii. Availability of Other Remedies

The Plaintiff's Complaint includes prayers for relief that may be wholly remedied by contract damages. For example, the Complaint requests that EBAD be restrained from increasing its prices above those contained in Amendment 2. But any overpayment by Beyond Gravity could be easily calculated and argued at the forthcoming arbitration

---

[12] Common sense dictates that customers will not wait forever, but a party seeking extraordinary relief must come forward with evidence suggesting that the harm is imminent.

proceedings.[13] ECF No. 1, pg. 17. In fact, Beyond Gravity appears to be poised to make precisely that argument. ECF No. 2-5, pg. 10. Finally, the court also is uncertain whether the loss of Amazon as a customer (or the good will associated with Beyond Gravity's relationship therewith) would be difficult to calculate without additional record justification. After all, lost business opportunities are commonly calculated in contract disputes. *Register.com*, at 427; *see Gargano v. Heyman*, 203 Conn. 616, 621, 525 A.2d 1343 (1987).

Weighing the delay, the speculative and conjectural nature of the purported harms, and the availability of other remedies, Beyond Gravity has not persuaded the court that it faces an irreparable harm.

### B. Serious Questions and Balance of Hardships

The parties' application of Swedish contract law answers fewer question than it creates.[14] However, the movant plainly raises a "serious question" on the merits. Still, the plaintiff must show the balance of hardships weighs in its favor.

As explained above, Beyond Gravity's assertion that it will suffer hardship if EBAD is not prevented from repudiating its contractual obligations is an unsubstantiated fear of what the future might hold.

On the other hand, EBAD has explained that it will need to divert resources from other projects with other customers to try and satisfy Beyond Gravity should the court grant the movant's motion – and even that will not be enough. However, EBAD's claim

---

[13] Beyond Gravity also purportedly stated it could manufacture the components itself, which may obviate the need to make overpayments. ECF No. 32, Raji Decl. ¶ 59 (Artner suggesting that "[Beyond Gravity] could manufacture HFUs itself at or near [$40,000]." *Id.*

[14] To be clear, analysis under Connecticut contract law would be different.

16

of potential hardship is not particularly strong, either. In fact, it might be said that its hardship lacks the concrete record evidence that Beyond Gravity omitted with respect to its relationship with Amazon or other customers.[15] But based on representations by counsel that EBAD has not yet established manufacturing lines capable of producing HFUs, the court is cautious not to expose EBAD to contempt via an injunction by ignoring its assertions that Beyond Gravity is requesting the impossible. ECF No. 2-2 ¶ 55 (Beyond Gravity asserting it takes 55 days to produce HFUs). After all, there were fewer than 55 days between March (one of the proposed launch dates) and the hearing before the undersigned.

On this record, the court finds the balance of hardships favors EBAD, but it bears repeating that its conclusion rests precariously on the state of the record before it.

### C. Public Interest

"All that the Court is being asked to do is to enforce the parties' bargained-for right to arbitrate any disputes that arise under the Agreement." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. Dec. 1, 2010). The court finds that the public interest is served by compelling the parties to arbitration.

### V. CONCLUSION

After careful consideration of the record and the arguments advanced by the parties, and having articulated and applied the applicable legal standard, the court cannot

---

[15] There is *some*, albeit weak, corroboration for EBAD's claim that it has not established productions lines for HFUs in the record. Previously, Beyond Gravity was invited to EBAD's facilities in Moorpark to inspect HRM production lines. *See* ECF No. 32-19, pg. 2. There is no similar indication that they toured HFU production lines.

find this to be the extraordinary circumstance which requires issuance of a preliminary injunction.  Accordingly, Beyond Gravity's motion is **DENIED.**

**IT IS SO ORDERED** in Hartford, Connecticut, this 19th day of February, 2025.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE